Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 89 C 8001 | **DATE** | 2/2/2001 |
| **CASE TITLE** | Transco Products, Inc. vs. Performance Contracting, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The court adopts in part the amended damages report of the special master and rejects the report with respect to the lost profits on the Ringhals project. The undisputed findings and recommendations are adopted as unopposed. The parties' objections (277) are therefore accepted in part and rejected in part. Parties have two weeks to prepare an agreed order stating the monetary value of the damages, in accord with the directions of the special master's recommendations, as modified by the accompanying opinion. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | FEB 5 2001 date docketed | 286 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 2/2/2001 date mailed notice | |
| MPJ | courtroom deputy's initials | 01 FEB -2 PM 6:04 Date/time received in central Clerk's Office | MPJ mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TRANSCO PRODUCTS, INC., )
)
        Plaintiff, )
)
v. ) No. 89 C 8001
)
PERFORMANCE CONTRACTING, INC. )
and PERFORMANCE CONTRACTING )
GROUP, INC, )
)
        Defendants. )

**DOCKETED**

**FEB - 5 2001**

## MEMORANDUM OPINION AND ORDER

This opinion addresses the damages issues in a long-standing patent dispute. Transco Products ("Transco") and Performance Contracting, Inc. ("PCI") both manufacture and install insulation for piping to be used in nuclear power plants. At issue here is a 1977 patent, No. 4,009,735, owned by PCI, for an invention of Gordon Pinsky's, for a specific construction of insulation blankets to be used in nuclear power plant containment areas (the "Pinsky patent"). In 1989 Transco sued for a declaration that the Pinsky patent was invalid, and PCI counterclaimed for infringement. The case has a long and convoluted history, including two trips to the Federal Circuit. In its current posture, the Pinsky patent has been determined to be valid and in part infringed; specifically, PCI may recover for steel jackets sold with Pinsky patent piping blankets, but not for infringement of Pinsky patent applications to

286

steam generator or pressure vessel insulation, because these were not raised in a timely way. *See Transco v. PCI*, No. 89 C 8001 (N.D. Ill. July 7, 1999) (unpublished order).

The remaining issues turn on damages. PCI claimed over $5 million in damages for sales of patented and nonpatented products at 17 projects on various nuclear power plants. Transco argued that the infringing products brought returns of an order of magnitude less, about $550,000, and that PCI is entitled to no lost profits at all. I referred the damages issues to a special master to decide certain outstanding issues connected to lost profits and other matters. The report is now in, and the parties have filed objections and responses to these. With respect to the points on which there are no objections, I adopt the special master's recommendations. With respect to the points on which there are objections, I adopt the special master's report in part and reject it in part, as explained below.

I.

I review a special master's legal conclusions de novo, *Cook v. Niedert*, 142 F.3d 1004, 1010 (7th Cir. 1998), and I accept findings of fact unless they are clearly erroneous. *Id.*; Fed. R. Civ. P. 53(e)(2). PCI claims that with regard to a number of factual questions, the special master failed to properly consider the burden of proof for damages, which is proof by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,

926 F.2d 1161, 1164 (Fed. Cir. 1991); *see also Kaufman Co., Inc. v. Lantech, Inc.,* 926 F.2d 1136, 1141 (Fed. Cir. 1991) (In lost profit context, a patentee need only show "a reasonable probability that the sales would have been made 'but for' the infringement."). Of course, for me to reject the special master's factual determinations based on the evidence, they must leave me "'with the definite and firm conviction that a mistake has been committed.'" *SmithKline Diagnostics,* 926 F.2d at 1164 (*quoting United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948))(meaning of "clearly erroneous" standard). The special master did state the burden of proof (see immediately below), but I address whether any of the specific factual disputes leave me with such a firm and definite conviction that a mistake has been made.

## II.

PCI objects to the special master's findings and recommendations in regard to price erosion damages. As the special master noted, such damages require the patentee to show "a reasonable probability that but for the infringement he would not have reduced or failed to increase prices." Price erosion damages are calculated on the basis of the patentee's lost profits. Although the special master awarded such damages for a number of projects, with respect to two projects, the LaGuna Verde reactor and the Duke Power job, he awarded no such damages, concluding that: (1) proof of PCI's lost profits through price erosion on

-3-

these two projects were "nebulous" or (2) sales of non-infringing goods and services should not be taken into account in any award of damages for price erosion. I agree with both conclusions.

A.

The special master found that price reductions on the LaGuna Verde project in Mexico were made because of Transco's infringement, but that PCI failed to meet "its burden of showing what the lost profits might have been." Contemporaneous letters and testimony were offered by Pinsky and a Mr. Bleigh, who offered the reductions in that project. The special master found that at least one of the reductions was offered in the expectation of increasing profits; that "no effort was made to show what its total scope of work was, how much [PCI] was paid, how [] much was charged for non-patented goods and services, or whether, as anticipated, it actually increased its profits."

PCI responds that the special master was required to believe the testimony of Messrs. Bleigh and Pinsky because no testimony was presented to the contrary and doubts in calculating damages are to be decided against the infringer. This is a non sequitur. The special master was not required to accept nebulous testimony whether or not it was opposed. *See Century Hone Div. of Desert Labs., Inc. v. United States*, No. 44-79, 1980 WL 20812, at *5 (Ct. Cl. Trial Div. Sept. 5, 1980) (factfinder not required to accept generalized testimony, if otherwise unsupported, even if witnesses

are not cross-examined thereon or the testimony is uncontradicted). The patentee must establish his damages by a reasonable probability, and testimony as defective as that offered here does not show a reasonable probability that there was the almost $400,000 in lost profits claimed. PCI refers to "contemporaneous documents" and "well-supported calculations," but the special master did not find these persuasive, and PCI's praise of them does not make them good. I find no clear error in the special master's determination with regard to the alleged lost profits in the LaGuna Verde project.

The second instance of purported price erosion was with the Duke Power job. Here PCI claimed lost profits of over $600,000. The special master denied this because the claimed damages "include[d] lost profits on steam generator blankets on which the Court has held that PCI is not entitled to recover. PCI [did not furnish[] proof of any breakdown between infringing products and non-infringing products and services . . . to substantiate the [claimed] damages." PCI says that the only difference between the situation here and with LaGuna Verde was the inclusion of steam generator blankets, but if Transco had not submitted a bid in the Duke power job with infringing products, PCI would not have had competition to meet, and therefore should get the full benefit of its price reduction for the $777,564 worth of piping. But the special master was not persuaded that PCI had shown any specific

amount of damages within a reasonable probability, so the extent, if any, in damages that accrued because of this price reduction is too uncertain and speculative to determine. I agree.

PCI further invokes the theory of "convoyed sales," under which a patentee can recover for lost profits due to sales of nonpatented products if "the components together constituted one functional unit, including the patented component, [and] . . . . [t]he auxiliary [nonpatented] components derived their market value from the patented [product] because they had no useful purpose independent of the patented [product]." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1550 (Fed. Cir. 1995) (the "entire market value rule"). Even if the sales were convoyed, this would not help because the amount of the damages was not established in these instances. PCI argues that the point of lost profits or convoyed damages is to place the patentee where he would have been had there been no infringement. Quite, but the problem here is that PCI failed to convince the special master that there was some particular place it would have been, some reasonable estimate of the damages, but for the infringement. The special master did not find PCI's damages calculations credible, and on review of the evidence, I find no clear error as regards the Duke Power project.

B.

In any event, as the special master found, the sales of associated patented and nonpatented products in question in the

LaGuna Verde, Duke Power, and other projects were not "convoyed," so that disaggregation of patented and nonpatented products would have been necessary to determine the recoverable damages on the patented products. Whether the associated components are single system (the "same machine"), or are, or are analogous to, functional units in which the nonpatented components derive their entire market value from the patented ones is a factual question. *See Rite-Hite,* 56 F.3d at 1550 (treating the question as one of fact).

PCI argues that "the blankets for the piping associated with the steam generator vessel blankets with D-rings, and the pressurizer blankets even assuming that the latter blankets are not already direct infringements, and associated jackets, should be considered part of the same 'machine.'" This is somewhat unclear, but the general point that even if PCI is barred from recovery for infringement of Pinsky patent applications to steam generator or pressure vessel insulation, it can recover for these and other nonpatented products as convoyed sales under the "entire market rule." This applies, PCI argues because: (1) the associated components are treated as a unit for purposes of seismic analysis; (2) the components were never separated out in a contract and were procured under one contract and one specification; and (3) there was unrefuted testimony that the components had to cooperate. Therefore, PCI says, they either comprise one machine or are

-7-

functionally related so as to be a single unit.

However, the relevant question here is whether the entire market value of the nonpatented product depends on the patented product, not on whether the components are analyzed as a unit for seismic purposes or are presented as associated in a contract. Moreover, if the necessity for the components to cooperate is enough for a convoyed sale or satisfies the entire market value test, then any complex system would involve a convoyed sale or satisfy that test. That is not the law. The special master properly rejected these arguments, noting that different kinds of insulation can be used on nuclear power plant steam generators and pressurizers, and was in fact used in plants where PCI had installed the Pinsky patent insulation on piping. He concluded that the entire market value of the nonpatented components sold by PCI did not depend on the value of the Pinsky patent. This was not a clearly erroneous result. It was, in fact, correct. Therefore, the sales were not convoyed, and PCI cannot recover for nonpatented products.

III.

In my July 1999 order, I ruled that PCI may recover lost profits for the 1992 Ringhals installation. PCI claimed $358,386 in lost profits on a job it calculates to be worth $742,886; Transco calculates the amount of infringing product it sold as $229,098 out of a total project value of $640,653, but also argues

that PCI should recover no lost profits at all. The special master rejected the testimony of PCI's damages expert, Richard Troxel, as "totally lacking in probative value," with respect to this project. The unsuccessful bidder was a joint venture between PCI and another company. Troxel made his damage assessments based on an allocation of the joint venturer's estimated costs for a job PCI never got. The special master accepted the critique of Transco's expert, Gregory Alexander, who said that lost profits damages could not accurately be calculated on this basis. The special master found that PCI had failed to provide appropriate proof of its lost profits on the Ringhals project, and recommended that it be awarded only a "reasonable royalty of 15% on infringing material and associated steel jacketing, if any." PCI replies that the contemporaneous bid document is clear and shows that the profit would have been 59% of the bid price; it argues that the lost profit should be "the same for all the other jobs, namely 57% if all products are considered, 63% if [] just [the] piping projects are considered."

Although the explanation for PCI's exact calculation is rather unclear, PCI has a point here. Although I accept the special master's rejection of Troxl's testimony that PCI would have made the same bid even if it had not had a joint venture partner, that only goes to the precise amount of the claimed lost profits. The special master did not, however, consider whether Troxl's general

method of looking at a bid in which the party participated was reliable. I think it was reliable enough to support an award of lost profits. Estimates about lost profits are in the nature of things approximate. In the two instances where the special master denied lost profits, the LaGuna Verde or Duke Power cases, there were complicating factors that prevented any even approximate determination of lost profits. These factors are missing with the Ringhals project. There is no complication about whether a price reduction might have increased profits, as with LaGuna Verde, or about disaggregating the value of only the patented products from the total, as with the Duke Power project. The special master was right that Troxel's method was not adequate to establish the precise amount of lost profits he claimed here, but I find that PCI showed some lost profits.

PCI contends with some plausibility that a 50% profit margin would not be excessive. It computes this figure by noting that Transco's normal contribution margin was 30%, and Transco's pricing was 20% lower than PCI's.[1] The special master found that lost profits of 50% of PCI's bid price was reasonable in a number of other projects. I do not see the difference between those contexts and the Ringhals project, so I reject the special master's recommendation with regard to this project, and I award PCI lost

---

[1] Immediately below I address PCI's dispute with this 20% figure.

profits on the Ringhals project, amounting to 50% of its bid price for the patented components for which it may recover, as specified in my July 1999 order and here.

PCI objects that the special master clearly erred in selecting a 20% price difference by which to increase all lost profit awards it made (not just at Ringhals) based on Transco's lower sell price. (PCI says "higher," but it clearly means "lower.") There was testimony that Transco's prices were 35% lower, and PCI argues that this creates "doubt" that must be resolved against the infringer as a matter of law. This argument and reference to the record is legally insufficient to create the necessary "doubt": the special master found as a matter of fact that the profits "do not show a uniform difference, but support a finding that PCI's prices were or would have been at least 20% higher, and that the 20% assumed difference would adequately compensate PCI for its total injury. . . ." This finding is not clearly erroneous, and I accept it.

IV.

PCI's final objection is to the special master's recommendation on the prejudgment interest rate. The special master followed the recommendation of PCI's own damages expert, Troxel, who stated that his normal practice was to use the 52-week T-bill rate, compounded monthly. The special master found that on the facts of this case, that rate would more than adequately compensate PCI for its injury. PCI demurs from its own expert's testimony,

and asks that I use the prime interest rate or its actual above-prime borrowing rate. PCI says the difference is about 3% a year, which is real money when we are talking about the sort of figures at issue in this case. PCI has two main arguments: (1) that the T-Bill rate will not actually compensate PCI for its injuries because PCI actually borrowed money above prime; and (2) that the lower interest rate offers an unjustified windfall for the infringer, Transco, because it makes a lot of money on the deal.

The windfall argument, incidentally unsupported by legal authority, is neither here nor there: if the T-Bill rate will in fact compensate PCI for its injuries, it doesn't matter if Transco made a profit by infringing on PCI's patent. A court must award "damages adequate to compensate for the infringement." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1569-70 (Fed. Cir. 1996) (*citing* 35 U.S.C. § 284). Enhanced damages are available for bad faith or willfulness, *id.*, but PCI does not argue that those factors apply here.

The question then comes down to whether the T-bill interest rate award would be adequate to compensate PCI for its injuries. To justify a higher rate of interest, PCI would have to show that there was a causal connection between any borrowing at higher rate and the loss of the use of the money as a result of the infringement. *See Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997). PCI may have borrowed money at prime or above,

but the special master found that PCI failed to relate the borrowing rates to particular PCI borrowings, that is, to tie the prime or above borrowing rates to the infringement. Indeed, even at this stage PCI does not say that the infringement caused it to take the higher-rate loans. But why should it be entitled to a higher interest rate if it cannot show that it had to pay a higher rate because of the wrong Transco committed? I adopt the special master's recommendation to use the 52-week T-bill rate for prejudgment interest.

V.

For its part, Transco argues that PCI is not entitled to any lost profits because PCI failed to prove them, that PCI failed to show the absence of non-infringing alternatives, and failed to rebut evidence of its lack of capacity to produce the lost sales. I do not find Transco's arguments persuasive: the special master's conclusions to the contrary are not clearly erroneous. Transco also moves that PCI should contribute to the special master's compensation, but Transco is the infringer. The motion is denied.

VI.

Accordingly, I adopt in part the amended damages report of the special master, but I reject the special master's report in part as regards the lost profits on the Ringhals project. The undisputed findings and recommendations are adopted as unopposed. The objections of the parties are therefore accepted in part and

rejected in part insofar as they are consistent with this determination. Transco will pay for the special master.

**ENTER ORDER:**

_Elai Bucklo_
**Elaine E. Bucklo**
United States District Judge

Dated: February 2, 2001

**Copies have been mailed to:**

**Attorneys for Plaintiff**
Allen H. Gerstein
Marshall, O'Toole, Gerstein,
   Murray & Borun
233 S. Wacker Drive, #6300
Chicago, IL 60606-6402

Jay S. Berlinsky
Schwartz, Cooper, Greenburg
   & Krauss, Chtd.
180 N. LaSalle Street, #2700
Chicago, IL 60601

**Attorneys for Defendants**
Darrell J. Graham
Grippo & Elden
227 W. Monroe Street, #3600
Chicago, IL 60606

Robert A. Vanderhye
Nixon & Vanderhye, P.C.
1100 N. Glebe Road
Arlington, VA 22201-4714

Seth Price
Stoker, Shapiro, Fussell & Wedge
2300 First Atlanta Tower
Atlanta, GA 30383

Paul E. Kriegen
Pravel, Gambrell, Hewitt,
   Kimball & Krieger
1177 W. Loop South, 10th Fl.
Houston, TX 77027

Jay R. Hoffman
Attorney at Law
19 S. LaSalle Street, #802
Chicago, IL 60603

**Special Master**
David J. Krupp, Of Counsel
Miller, Shakman & Hamilton
208 S. LaSalle Street, #1100
Chicago, IL 60604